[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 22-14011

_____

JOHN MEISEL,

Petitioner,

*versus*

SECURITIES AND EXCHANGE COMMISSION,

Respondent.

_____

Petition for Review of a Decision of the
Securities and Exchange Commission
Agency No. 2017-150

_____

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

At issue today is a challenge to the United States Securities and Exchange Commission's (the "Commission") denial of a whistleblower award. The Commission filed a civil action relating to a Ponzi scheme against several defendants in the United States District Court for the Northern District of Ohio. Petitioner John Meisel read about the action in the newspaper and suspected that his former tenant, Jeremy Hixson, was part of the scheme. Meisel called the Commission's trial attorneys and informed them of his suspicions. Meisel also corresponded with a court-appointed receiver and provided information that assisted the receiver in recovering funds related to the scheme. After judgment was entered against the defendants in the Commission's action, Meisel applied for a whistleblower award. The Commission denied his application and Meisel filed a petition for review with this Court.

Meisel claims that the Commission's denial of a whistleblower award was arbitrary and capricious and was not supported by substantial evidence. However, the Commission's denial of an award was based on two sworn declarations by a Commission attorney who worked closely on the investigation and who unambiguously stated that the Commission did not use the information provided by Meisel in any way. These statements, credited by the Commission, sufficiently support the Commission's action with substantial evidence.

Moreover, Meisel's assistance to the receiver does not qualify for an award because the receiver is an independent court officer, and giving information to the receiver does not satisfy the statutory requirement of giving information to the Commission. Finally, Meisel does not qualify for an award based on any "related actions" brought against Hixson, because the statute and regulations require that Meisel qualify under the Covered Action as a prerequisite to bringing in any related actions, which he does not.

Accordingly, we deny Meisel's petition for review.

## I.

### A.

Pursuant to the Securities Exchange Act of 1934, as modified by the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Act"), the Commission "shall pay an award" to "whistleblowers who voluntarily provided original information to the Commission that led to the successful enforcement of the covered judicial or administrative action, or related action." 15 U.S.C. § 78u-6(b)(1). A covered action is an action "brought by the Commission under the securities laws that results in monetary sanctions exceeding $1,000,000." *Id.* § 78u-6(a)(1). A related action is an action brought by the Attorney General, an appropriate regulatory authority, a self-regulatory organization, or a state attorney general in connection with a criminal investigation based upon information provided by a whistleblower "that led to the successful enforcement of the Commission action." *Id.* § 78u-6(a)(5).

The Act further states that the "Commission shall have the authority to issue such rules and regulations as may be necessary or appropriate to implement" the whistleblower program. *Id.* § 78u-6(j). Pursuant to this authority, the Commission has promulgated rules for the whistleblower program, codified at 17 C.F.R. §§ 240.21F-1 through 240.21F-18 ("Rule 21F-1 through Rule 21F-18").

Among other requirements, Rule 21F-4 provides that whistleblower information "leads to successful enforcement" of the covered action if: (1) the whistleblower provides original information to the Commission that causes the Commission to "commence an examination, open an investigation, reopen an investigation that the Commission had closed, or to inquire concerning different conduct as part of a current examination or investigation," *and* the Commission subsequently brings a successful action based in whole or in part on the information; or (2) the whistleblower provides "original information about conduct that was already under examination or investigation," and that information "significantly contributed to the success of the action." *Id.* § 240.21F-4(c)(1), (2).[1] Rule 21F-4(c) is exhaustive: a whistleblower is entitled to an award only if one of the Rule 21F-4(c) standards is satisfied. *Doe v. SEC*, 28 F.4th 1306, 1312–13 (D.C. Cir. 2022) (per curiam)

---

[1] Rule 21F-4(c)(3) contemplates a third scenario involving internal whistleblower procedures not at issue in this case and, in any event, information provided under (c)(3) must also satisfy "either paragraph (c)(1) or (c)(2) of this section." 17 C.F.R. § 240.21F-4(c)(3).

(citing Securities Whistleblower Incentives & Protections, 76 Fed. Reg. 34300, 34357 n.438).  A claimant's failure to satisfy any one of these statutory requirements will doom his whistleblower award application.

Additionally, whistleblower information must be provided directly "to the Commission, in a manner established, by rule or regulation, by the Commission."  15 U.S.C. § 78u-6(a)(6).  The Commission has established the manner required in Rule 21F-9, which requires that a whistleblower submit information to the Commission using a "Form TCR" submitted to the Commission by mail, fax, or online portal within 30 days of first providing the Commission with information.  17 C.F.R. § 240.21F-9(a), (e).

**B.**

On May 29, 2014, the Commission filed a civil enforcement action in the United States District Court for the Northern District of Ohio against several individuals—Thomas Abdallah, Kenneth Grant, Mark George, Jeffrey Gainer, and Jerry Cicolani, Jr.—involved in a Ponzi scheme (the "Covered Action" or the "*Abdallah* case").  In essence, the Commission alleged that the defendants in the *Abdallah* case marketed their company, KGTA Petroleum, Ltd. ("KGTA"), to investors as a petroleum company that earned profits by buying and reselling crude oil and refined fuel products.  The KGTA investment "opportunity" promised astronomical returns with no risk.  In reality, however, KGTA never bought or sold fuel or oil, and funds raised from new investors were used to pay fake

returns to old investors and to generate cash for Grant's and Abdallah's personal use.

Around the same time that the KGTA scheme was taking place, Meisel rented a house to Hixson. While Hixson was a tenant, he paid monthly rent to Meisel with checks drawn from the account of an entity called Quest Innovation LLC ("Quest"). Quest's address was listed as the house Meisel was renting to Hixson. Meisel asked Hixson about Quest, and Hixson told Meisel that Quest served a dual purpose of hiding finances from his wife during a divorce proceeding and as a business account for a "side business arrangement" in which Hixson was involved. On another occasion, Hixson told Meisel that he was "set up" in a business arrangement with someone selling surplus oil and gas, and that he was earning over $20,000 a month in commissions from investors.

In June 2014, Meisel read a newspaper article about the KGTA scheme and the Commission's lawsuit against the *Abdallah* defendants. Based on details in the article and the statements Hixson had made to him, Meisel became suspicious that Hixson was involved in the KGTA scheme.

On July 7, 2014, Meisel contacted Timothy Leiman, a Commission lawyer listed in the lawsuit, who was in fact a senior trial counsel for the Commission. Meisel shared with Leiman his suspicions that Hixson was connected to the KGTA scheme. Meisel also told Leiman about Quest, and his belief that Quest was used to hide money received from KGTA.

In August, Meisel accessed the PACER court filing system of his own accord and reviewed publicly available documents on the *Abdallah* case docket, including one titled "Gainer Spreadsheets" that was attached as an exhibit to the Commission's Emergency Motion for a Temporary Restraining Order. As Meisel observed, the Gainer Spreadsheets contained many entries referring to "Quest" or "Quest Innovation." Meisel also observed that the Gainer Spreadsheets contained entries that stated "hix gets half" that were used in connection with notations for "Quest Innovations." On August 25, 2014, Meisel made a submission to the Commission through the Tips, Complaints, and Referrals system—a "Form TCR"—containing a written summary of his efforts to date, as well as a detailed account of what he had learned from reviewing the Gainer Spreadsheets.

On December 3, 2014, the district court in the Covered Action appointed a receiver "for the purposes of marshaling and preserving all assets of the Defendants and Relief Defendants." The court authorized the receiver to bring legal actions necessary to discharge his duties. In December 2016, the receiver filed an action against Quest in the Northern District of Ohio "to recover receivership property." Between 2016 and 2020, Meisel communicated with the receiver continuously to provide facts, information, and analysis to assist the receiver with recovering receivership property.

On May 10, 2016, Hixson pleaded guilty in the United States District Court for the Northern District of Ohio to bankruptcy

fraud and two counts of making false statements. On March 13, 2017, the Commission began an administrative proceeding against Hixson, reflecting a settlement in which Hixson agreed to be barred from associating with certain securities industries professionals and from participating in any offering of penny stock. The Commission's administrative proceeding against Hixson included no monetary relief.

Between 2017 and 2018, the Commission obtained final judgments against Abdallah, Grant, George, Gainer, and Cicolani in the Covered Action. Grant, Abdallah, George, Gainer, Cicolani, and Cicolani's girlfriend, Kelly Hood, all later pleaded guilty in the United States District Court for the Northern District of Ohio to federal criminal charges for their roles in the KGTA Ponzi scheme.

## C.

On October 31, 2017, The Commission's Office of the Whistleblower posted a Notice of Covered Action for the *Abdallah* case. On January 22, 2018, Meisel submitted an award application for the Covered Action.

On July 15, 2020, the Commission made a Preliminary Determination denying Meisel's award claim. Attached to the Commission's Preliminary Determination, and dated the same day, was a declaration by Christopher White, an attorney in the Commission's Division of Enforcement (the "Initial Declaration"). In the Initial Declaration, White stated that he was one of the "primary Enforcement attorneys" assigned to the KGTA Ponzi scheme investigation. The Initial Declaration concluded:

Meisel's information did not contribute to the *Abdallah* case. The Commission's complaint had already been filed before Meisel contacted us. His TCR submission states that reading a news article about the *Abdallah* case was what caused him to realize Hixson might be involved in a Ponzi scheme. By the time Meisel contacted us, we had already seen the checks from KGTA to Quest Innovations, we had already obtained the spreadsheets from Gainer stating that his commissions should be split with "hix" and "quest", and we already knew Hixson introduced an investor to Gainer. The information Meisel provided about the rent payments Hixson made from Quest's account and the statements Hixson made to Meisel was new, but that information was not used in the *Abdallah* case. All of the other information subsequently provided by Meisel to Leiman or me was already known to the staff.

Meisel filed a timely response and request for reconsideration on September 30, 2020.

On November 4, 2022, the Commission issued a final order denying Meisel's claim for a whistleblower award. In the order, the Commission explained that, as a threshold issue, Meisel first provided information to the Commission four months after the Commission opened its investigation and over a month after it filed its complaint, so he "cannot be credited with causing the staff to open an investigation." Second, the Commission stated that Meisel's information did not significantly contribute to the success

of the Covered Action, because attorney White stated that Meisel's information did not advance the investigation, and the Commission credited that declaration. The Commission also rejected Meisel's argument that the Commission's subsequent administrative proceeding against Hixson should be treated as part of the Covered Action, because the application of the relevant rule "is predicated upon [Meisel] qualifying for an award for the Covered Action," and in any event the rule only applies to "proceedings which result in a monetary sanction," which the administrative proceeding did not. Finally, the Commission rejected Meisel's argument that he contributed to the Covered Action through assistance to the receiver "[b]ecause the Receiver does not work for the Commission or represent the interests of the Commission, [so] any information [Meisel] provided to the Receiver does not qualify [him] for a whistleblower award."

Attached to the Commission's final order was a supplemental declaration from White, dated October 3, 2022 (the "Supplemental Declaration"). The Supplemental Declaration reaffirmed and incorporated all the statements in the Initial Declaration. The Supplemental Declaration also stated that "[t]he staff first became aware of [Hixson] and Quest Innovations no later than March 2014. The staff was already aware of . . . Hixson's . . . involvement with Quest no later than April 18, 2014." White also stated that "Meisel's information was not a motivating factor in the staff's decision to interview Hixson. Nor did the information provided by Hixson during his August 7, 2014 interview advance the Abdallah Investigation or contribute to the charges brought in the

Covered Action." Finally, White said, "Meisel's information did not help or otherwise provide an advantage to the staff during settlement discussions with the defendants in the Covered Action."

This timely petition for review followed.

## II.

On a petition for review, this Court will "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). The Commission's application of the law is reviewed *de novo*. *See Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892, 896 (11th Cir. 2022). In reviewing the Commission's factual findings, substantial evidence "requires more than a scintilla"; it "is less than a preponderance, but rather such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Viverette v. Comm'r of Soc. Sec.*, 13 F.4th 1309, 1314 (11th Cir. 2021) (citations and quotation marks omitted). Finally, in our substantial evidence review, "we may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [agency]." *Id.* (citation and quotation marks omitted). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

## A.

The Commission's conclusion that Meisel did not qualify for an award for the Covered Action was neither arbitrary nor

capricious, nor was it unsupported by substantial evidence. As we previously described, the Commission "shall pay an award" to any "whistleblower[] who voluntarily provided original information to the Commission that led to the successful enforcement of the covered judicial or administrative action." 15 U.S.C. § 78u-6(b)(1). This language is unambiguous: the statute calls for "original information . . . that *led* to the successful enforcement"–not information that *could have led* or *may have led* or *would have led* to a successful enforcement, if only the Commission had used it. *See id.* (emphasis added). Because there can be no dispute that the Commission's investigation was already underway and an action had been filed in district court by the time Meisel learned of the scheme in the newspaper and began to investigate, he does not argue that he caused the Commission to open or reopen an investigation. Instead, Meisel claims that his information "significantly contributed to the success of the action" already under investigation. *See* 17 C.F.R. § 240.21F-4(c)(2). In determining whether information "significantly contributes" to the success of an action, the Commission considers, among other things, whether the information allowed the action to be brought "in significantly less time or with significantly fewer resources," if there were "additional successful claims," or if there were "successful claims against additional individuals or entities." Securities Whistleblower Incentives & Protections, 76 Fed. Reg. 34300, 34325 (June 13, 2011).

As the record reflects, the Commission's final determination that Meisel did not meet any part of this standard is supported by the two sworn declarations by White. White was one of the

primary enforcement attorneys assigned to the investigation that led to the Covered Action.  In both the Initial Declaration and the Supplemental Declaration, White states in no uncertain terms that "Meisel's information did not contribute to the *Abdallah* case," nor did it "lead to any monetary recovery."  Moreover, White added that "Meisel's information was not a motivating factor in the staff's decision to interview Hixson," nor did it "help or otherwise provide an advantage to the staff during settlement discussions with the defendants in the Covered Action."

White also says that by the time Meisel contacted the Commission, the Commission had already seen the checks from KGTA to Quest Innovations, had obtained spreadsheets from Gainer stating that commissions should be split with "hix" and "quest," and was aware of Hixson's connection to the KGTA scheme.  White notes that most of the information provided by Meisel related to Hixson, Quest, and Hixson's wife, and none of them were charged as part of the Covered Action.  The Supplemental Declaration concluded that,

> [a]s stated in the Initial Declaration, aside from information about rent payments made by Hixson from Quest's account and Hixson's statements to [Meisel] –neither of which advanced the Abdallah Investigation or contributed to the charges in the Covered Action–the information Meisel provided was already known to the staff from a source other than Meisel and prior to Meisel's contact with Commission staff.

These declarations–which were both credited by and relied upon by the Commission–provide "more than a scintilla" of evidence that the Commission did not use the information provided by Meisel in the Covered Action. The declarations would also allow a reasonable person to conclude that Meisel's information did not significantly contribute to the Covered Action. *Viverette*, 13 F.4th at 1314.

Meisel's challenges to the Commission's conclusions are unpersuasive. First, Meisel argues that although the Commission may have known about Hixson's and Quest's connections to the KGTA scheme individually, it was impossible for the Commission to have known about Hixson's connection to Quest without the information provided by Meisel. But the Supplemental Declaration directly states that Commission staff were aware of Hixson's involvement with Quest prior to any contact by Meisel, and the Commission credited this assertion. Meisel also argues that the statements in the White Declarations are not true, but we may not substitute our judgment of the facts for the Commission's. *See id.* The sworn declarations provide "such relevant evidence as a reasonable person would accept as adequate to support" the conclusion that the Commission did, in fact, make the connection between Hixson and Quest prior to Meisel's information. *Id.* (citation omitted). At this point, we must defer to the Commission's judgment.

Second, Meisel claims that there is a fatal contradiction between White's Initial Declaration and his Supplemental

Declaration that must bar the Commission from crediting either declaration. Specifically, Meisel points out that the Initial Declaration states that, "[o]n August 18, 2014, [White] learned through [his] investigative efforts that Hixson had admitted to an investor that Quest was an entity owned by him and his wife, and that Quest had been paid fees from KGTA for the investor's investments." The Supplemental Declaration states that "[t]he staff first became aware of [Hixson] and Quest Innovations no later than March 2014. The staff was already aware of both Hixson's and [his wife's] involvement with Quest no later than April 18, 2014." Meisel suggests that we must read these declarations as contradictory because the first declaration pinpoints August 2014 as the time when the staff became aware of Hixson–which would bolster Meisel's assertion that his July 2014 communications with the Commission were particularly relevant–while the second declaration pushes the date of the Commission's awareness of Hixson back several months, to April 2014, crippling Meisel's claim.

We do not read the chronology, however, as necessarily creating a conflict, let alone a fatal one. In fact, upon careful review, White's two declarations can be read as establishing a consistent timeline: by March 2014, the staff had Hixson and Quest on their radar; on April 18, the staff was aware of Hixson's and his wife's involvement with Quest; and then on August 18, White learned that Hixson *admitted to an investor* that he owned Quest, and that KGTA paid Quest. Because we defer to the Commission's judgment of the facts, and it is readily possible to do so, we too must read the statements as consistent. *See id.*

In any event, even if the declarations necessarily created a genuine inconsistency as to those dates–which we do not find–this inconsistency still would not change White's consistent assertions that the information Meisel provided the Commission did not contribute in any way to the Covered Action. Again, where these statements have been credited by the Commission, "findings of fact made by administrative agencies, such as the [Commission], may be reversed by this court only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004). Even if Meisel were correct that he first connected Hixson to Quest, it was not unreasonable for the Commission to conclude that this information did not significantly contribute to the Covered Action.

In short, the Commission's conclusion that Meisel did not qualify for a whistleblower award was neither arbitrary nor capricious, nor unsupported by substantial evidence.

## B.

Meisel also argues that the Commission did not properly credit him for the assistance he gave to the court-appointed receiver between 2016 and 2020. To Meisel's credit, the receiver wrote a letter stating that Meisel provided him "new information that was unknown to [the receiver] at the time," that was meaningful and useful in the receiver's efforts to recover assets for the benefit of the victims of the KGTA Ponzi scheme. However,

regardless of how helpful or laudable Meisel's assistance was to the receiver, assisting the receiver does not qualify Meisel for an award.

The plain text of 15 U.S.C. § 78u-6(a)(6) states that a whistle-blower is an individual who provides information "to the Commission, in a manner established, by rule or regulation, by the Commission." *See also id.* § 78u-6(b)(1) (stating that the Commission shall pay an award to a whistleblower who "voluntarily provided original information *to the Commission* that led to the successful enforcement of the covered judicial or administrative action, or related action" (emphasis added)). Rule 21F-9 governs the procedures for submitting information as the basis of a claim for a whistleblower award. *See generally* 17 C.F.R. § 240.21F-9. In relevant part, Rule 21F-9 requires that a whistleblower must submit information to the Commission in a "Form TCR" mailed, faxed, or submitted to the Commission through an online portal. *Id.* § 240.21F-9(a). Compliance with these rules is necessary to qualify for the benefits of being a whistleblower. *See Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160–61 (2018) (holding in the context of another subsection of 15 U.S.C. § 78u-6 that a "whistleblower" is a person who provides information to the Commission specifically, not to any other entity).

Meisel does not claim that he provided any of the information he gave to the receiver directly to the Commission by any means, much less by using a Form TCR as required by 17 C.F.R.

18                    Opinion of the Court                    22-14011

§ 240.21F-9.[2]  Because Meisel concedes that he never provided any of the information he gave to the receiver to the Commission, he is statutorily barred from qualifying for an award in connection to that information.

Meisel's rebuttals are unpersuasive.  Meisel first urges that giving information to the receiver is the same as giving information to the Commission, on the theory that the receiver is a *"de facto* agent of the SEC,"* merely in "the guise of being an officer of the court," and that the receiver consequently was "acting as a representative and conduit of information by which the SEC benefits." However, as the Commission's internal rules tell us:

> Although the Commission may seek the appointment of a receiver in an enforcement action filed in federal court, a receiver does not work for the Commission, represent the interests of the Commission, or even represent the interests of investors.  Rather, a receiver is an officer of the court, appointed by the court to take custody of assets over which the court asserts jurisdiction (the receivership estate), for the benefit of all persons whom the court may later adjudge to have rights in the property.

---

[2]     Although Meisel had submitted a Form TCR to the Commission in 2014, covering the information he told Leiman over the phone and his review of the Gainer Spreadsheets, Meisel's assistance to the receiver did not begin until 2016.

Whistleblower Program Rules, 85 Fed. Reg. 70898, 70905 (Nov. 5, 2020).

That receivers are officers of the court, not agents or representatives of a party, is also long established in case law. *See, e.g., Sterling v. Stewart*, 158 F.3d 1199, 1201 n.2 (11th Cir. 1998) ("A receiver is a neutral court officer appointed by the court, usually to 'take control, custody, or management of property that is involved in or is likely to become involved in litigation for the purpose of . . . undertaking any [ ] appropriate action.'" (quoting 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2981, at 5 (1973))); *SEC v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) ("[T]he Receiver is an officer of the court. Even though the Receiver may at times take adverse positions to certain claimants, the Receiver acts under supervision of the court . . . ." (citations omitted)); *Booth v. Clark*, 58 U.S. (17 How.) 322, 327 (1854) ("A receiver is an officer of the court which appoints him . . . .").

The Commission's final order was therefore correct in concluding that "[b]ecause the Receiver does not work for the Commission or represent the interests of the Commission, any information [Meisel] provided to the Receiver does not qualify [him] for a whistleblower award."

Meisel resists this conclusion, arguing first that the receiver was only authorized to recover receivership property in consultation with the Commission. However, as the Commission observes, the receiver nevertheless retained unilateral power to

undertake such investigations or initiate such actions, save only that leave of the court, not the Commission, was required to resume or commence certain litigation.

Meisel next says that the receiver was required to submit to the Commission routine billing. While it is true that the receiver must serve upon counsel for the Commission "a complete copy of the proposed [quarterly fee] Application" at least thirty days prior to filing it with the court, the receiver ultimately "shall apply to the Court for compensation and expense reimbursement." It is the court, not the Commission, that approves and compensates the receiver's fees.

Third, Meisel claims that because the Commission had an obligation to assist the receiver in locating assets, Meisel's assistance to the receiver in turn assisted the Commission in fulfilling its duty. But here, Meisel has conflated two distinct concepts: information that may be *helpful to* the Commission and *giving* information to the Commission. Just because information Meisel provided to a third party ultimately may be helpful to the Commission in no way eliminated his obligation to give the information to the Commission, as is required by statute and regulation.

Similarly, Meisel misunderstands how the "original source" exception applies. Meisel cites to Rule 21F-4(b)(5) to argue that, because he was the original source of the information, he could give the information to the receiver and the information would "flow through" the Receiver to the Commission. But this is not how the original source exception applies. Rule 21F-4(b)(5), when

read in the full context of the regulation, essentially says that if a whistleblower submits information to the Commission and the Commission had already heard the information from someone else, the whistleblower is nevertheless entitled to an award if he were the original source of the information that the Commission had already heard elsewhere. *See generally* 17 C.F.R. § 240.21F-4(b)(5)–(6). What the exception does not do is entitle a whistleblower to tell whomever he likes, but never tell the Commission, and then collect a whistleblower award when the Commission eventually receives the information from another source. *See Doe (Claimant #2) v. SEC*, No. 22-1652, 2023 WL 3562977, at *2 (3d Cir. Mar. 23, 2023) (upholding the denial of an award where claimant wrote a report that the Commission based its action on, but claimant only published the report online, where the Commission independently found it, and never provided the report directly to the Commission).

Finally, Meisel relies upon a number of Commission orders determining the award claims for other whistleblower applications, each of which bases the award given to the whistleblower on the successful monetary recovery by the receiver. Meisel argues that these orders "all support the inclusion of information given [to] a Receiver that is designed and intended to assist the Commission, and which ultimately does so, as a proper basis for the award of whistleblower benefits."

Here again Meisel confuses two distinct concepts: qualifying for an award, and what the award itself is based on once a

whistleblower qualifies.  It's true that, once a whistleblower qualifies for an award, the Commission has regularly treated money that the receivership was able to recover to be distributed to injured investors as collected monetary sanctions upon which a whistleblower's award may be based.  *See, e.g.*, Order Determining Whistleblower Award Claim, Release No. 88015, 2020 WL 374345, at *1 n.3 (Jan. 22, 2020) ("We have treated those amounts distributed to injured investors by the court-appointed receiver in the Covered Action as collected monetary sanctions on which Claimant's award can be based."); *see also* 17 C.F.R. 240.21F-4(e) ("Monetary sanctions means: (1) An order to pay money that results from a Commission action or related action which is either: (i) Expressly designated as a penalty, disgorgement, or interest; or (ii) *Otherwise ordered as relief* for the violations that are the subject of the covered action or related action . . . ." (emphasis added)).  In other words, had Meisel qualified for an award in the first place, the orders he cites would have supported the proposition that money distributed by the receiver could have been used to calculate his award.  But Meisel did not qualify for an award in the first place, and the orders do not say that assisting the receiver qualifies him for an award where he otherwise did not qualify.

## C.

Finally, Meisel argues that he qualifies for an award in the related cases: namely, the criminal action against Hixson for fraud and false statements, the Commission's administrative action against Hixson, and the Receiver's action against Quest.  Once again, Meisel's arguments do not prevail.

Title 15 U.S.C. § 78u-6(a)(5) reads this way:

> The term "related action" when used with respect to any judicial or administrative action brought by the Commission under the securities laws, means any judicial or administrative action brought by [the U.S. Attorney General, an appropriate regulatory authority, a self-regulatory organization, or a state attorney general] that is based upon the original information provided by a whistleblower pursuant to subsection (a) that led to the successful enforcement of the Commission action.

*See id.* § 78u-6(a)(5) (referencing *id.* § 78u-6(h)(2)(D)(i)). Rule 21F-11 clarifies that a whistleblower cannot independently qualify under a related action: instead, the whistleblower must qualify for an award under the Covered Action, and then may use related actions to calculate the amount of the award for which the whistleblower is eligible. *See* 17 C.F.R. § 240.21F-11(a) ("If you are eligible to receive an award following a Commission action that results in monetary sanctions totaling more than $1,000,000, you also may be eligible to receive an award in connection with a related action.").

Rule 21F-11 is clear. Because Meisel is not eligible for an award in the Covered Action for the reasons we've already explained, he cannot qualify for an award in any related actions. In any event, the administrative proceeding against Hixson did not result in any monetary penalty at all, so it could not contribute toward an award. Additionally, neither the receiver nor the

Commission itself are one of the entities that may bring a "related action" as enumerated in 15 U.S.C. § 78u-6(h)(2)(D)(i).  Therefore, the only potential "related action" at issue here is the criminal action in which Hixson pleaded guilty to bankruptcy fraud and two counts of making false statements, which yielded restitution in the amount of $73,794.32.

The long and the short of it is that the evidence supports a finding that the Commission never used Meisel's information and, because the Commission never used the information, Meisel's information did not lead to the success of the Covered Action.  The Commission's action was neither arbitrary nor capricious, nor was it unsupported by substantial evidence.

**PETITION DENIED.**